May I proceed, Your Honour? Yes, sir. Good afternoon, Your Honours. My name is Michael Barr, and I'm here on behalf of Royal Indemnity Company. This appeal presents the... I'm sorry? You're reserving time for rebuttal? Oh, yes, I'm sorry. Three minutes, please, Your Honour. Thank you for asking. Yes, sir. This appeal presents the question whether a trustee to a complex securitization transaction, which involves hundreds of millions of dollars, will be held accountable for the specific contractual undertakings that they make. The District Court said no and granted summary judgment to Wells Fargo only by adopting the assertion that Wells Fargo made that their say otherwise. Now, critically, the Court reached that conclusion by imposing Judge Farnon's view of the context of the contracts, which I respectfully submit is, in effect, a euphemism for a fact-finding concerning in between two different reasonable interpretations of the contracts, concluding in that case that Wells Fargo only had an obligation to review two of four electronic data submissions that they received every month concerning the transactions at issue. Now, the fundamental underpinning of our claim, it is undisputed that Wells Fargo received every week and every month specific data that revealed the extent of the Student Finance Corporation fraud here. That fraud here is fairly easy to explain in retrospect, I should say in hindsight. Unbeknownst to Royal, SFC was making approximately $50 million worth of payments on behalf of students to make it appear that those student finances were performing. Royal's principal tool for monitoring that performance was monthly servicer reports that they received, which showed and in effect summarized monthly payments, summarized delinquency and default information, and showed what the performance of those loan pools were. Now, those monthly servicer reports had a specific line item titled servicer advances, which is where if Student Finance Corporation was making payments on behalf of students, that's where those payments should have appeared. Instead, what happened here to mask the fraud, all of those payments were lumped together under a specific line item, scheduled payments received on student loans. So they were all put together, even though there was a specific line item in the servicer reports for recording what Student Finance Corporation was actually doing. But does the contract itself provide that all payments into the lockbox account must be made by student debtors? It says they must be made by obligors, and those are people who are obligated to make payments on those student loans. That could be students, that could be guarantors on their payments, but it certainly can't be Student Finance Corporation itself. It's a critical distinction here, Your Honor, in terms of what it provides. So whilst Fargo receives on a weekly basis, on a monthly basis, they get the same phony servicer reports that Royal gets, but they also get weekly an access data tape, and then monthly an access data tape, as well as two additional loan schedules, which show what the true performance of the loans were. Because if you look at the monthly access tape, and let's just focus on that alone, it appears that the record on page 7821 to 8004, that tape shows, and we've highlighted the particular portions, that enormous portions of the entries that were made were for interest only, no principal, and they're all made on the same day of every single month. You're looking at the monthly service report? I'm sorry, no. We're looking at the monthly access data tape that was received by Wells Fargo each month, and obviously we're showing a particular example of that. What information in that document would have told Wells Fargo that there was a fraud being committed here? The information that would have shown it. Here you have thousands of... I'm sorry to interrupt you, but can you tell from this document itself, or must you make a comparison between this document and other documents? Well, two things. One, you can tell just by looking at the document itself that something is very wrong. And what the something that's very wrong is, it shows on one day, here you have tens of thousands of students. But is there anything here in this document itself that tells Wells Fargo that there is a fraud being committed? Absolutely. You're right. What is on that document is the fact that even though you have tens of thousands of individual student payments being made with respect to each of their individual loans, and just like any other amortizing loan that any one of us would have on a car, a house, or anything else that is a principal component and an interest component, all that is shown on that schedule for hundreds of pages are interest only payments and all appearing on the same day of the month, no principal alone. When you put that together and anyone who has experience in this industry has testified in this matter, that indicates that something is very wrong here. Furthermore, anyone who is working in this industry, meaning all the experts who testified, the witnesses who testified, the Student Finance Corporation from Wells Fargo, said that if they had looked at that information, that clearly that indicates that something is wrong with the program. Was there expert testimony in this case that stated that if I, as an expert, if I look at access data base file, I can see that there was a fraud here? Yes, Your Honor. That indeed was the test. Well, that is the testimony provided in the expert report that Royal submitted in the action. Obviously, the case did not go to trial. And critically, Your Honor, even by the virtue of the questions that you are asking here, this is the kind of determination in terms of whether that information was sufficient to establish a fraud or not, who reviewed it and what they thought when they reviewed that material or not, is exactly the kind of fact-finding that should have been made at a trial here, not on a summary judgment. Supposing accompanying this document is information like you said, there are students who can't make the payment, so they're just making payments on interest. Your Honor, number one, there was no evidence that anyone at Wells Fargo had indicating that because they never even looked at these documents at all. They did not take the very next step of saying something looks a little strange on this document. I need to make a further inquiry to find out whether there is something wrong here. It's as if, Your Honor, here they're looking at a service report. Because we're assuming that they have to look at this document. I know their position is that we don't have to look at this document. Correct. But the testimony is also they didn't look at this document, that they cracked these open, they saw that there was data on them, never examined them, never sought to determine and never made the comparison required by Section 8.19. If they were a backup servicer, do they really have to look at this document? Your Honor, the agreement in Section 3.8b, which defines what the tapes are and the information that they're to receive, specifically states that this is information being provided to the trustee. In that definition, it doesn't distinguish between any capacity in which they're receiving that material, doesn't indicate any distinction between certain tapes that are supposed to go one place and be used for one purpose and other tapes that are supposed to go elsewhere. When you look in Section 8.19, again, it refers to the duties of the trustee, not of the trustee in its capacity as a potential successor servicer, not in any other capacity. It specifically states trustee and trustee alone. But doesn't the – oh, I'm sorry. Go ahead. Just one point. Sure. Mr. Barr, you mentioned that there was an affidavit submitted that made clear that you can discern fraud by simply looking at the access database file. Your Honor, the expert report provided by David Hacker, which appears at the record beginning at page 4150, who is one of the experts that, well, and again, the deposition testimony provided obviously didn't get to the point of the trial. And his statement is that the access database. He's saying that anyone looking at this would have been able to determine, who's, you know, again, in this industry, would have been able to determine that something was terribly amiss here. And again, their obligation here is not to quote, unquote, report a fraud. Their obligation was to take the information they received, to compare it on the servicer report. And when you compare the two, and you know that here you have – you know you have a line for servicer advances, which are supposed to be payments from the Student Finance Corporation. You have a separate line for payments that are supposed to be received on behalf of the student loans. And you see a zero on the servicer advances. You see all the payments lumped together under the line of the payments supposed to be received on schedule of loans. And then you look at this document, which was, again, received every week, every month, for page after page after page, indicating no principal payments all being made on the same day. That is a discrepancy. This wasn't saying they had to ferret out some fraud here. All that they were obligated to do was compare and review and report to us on discrepancies that they may have found. Well, now, but I mean, aren't you really foisting sort of an additional duty on them? I mean, aren't you foisting – Wells Fargo was not obligated to search for deeper meaning, was it? I mean, we have some pretty – I mean, doesn't a contract set forth kind of a – I mean, they may have missed it, but what does the contract say? Doesn't it set forth kind of a bright-line test? Your Honor, the contract says a couple of things. It says, first of all, they're supposed to receive the tape used to calculate the monthly service report. This information was clearly part of the information used to calculate the monthly service report. They were supposed to then compare the information on the tape to what was contained in – with respect to delinquency ratios, default ratios, and with respect to the aggregate principal balance. Looking at this document, because, of course, this is the document that reported scheduled loan-by-loan-by-loan-by-loan payments, in order to even look at that to sum up what the principal payments were, which, of course, is the direct thing that would impact the change in the aggregate principal balance from month to month, again, they would have seen this. If this was something where they had to, you know, as I said, do a complicated analysis. They use a lot of lines in their brief talking about the complications of what they would have to do. It's not the case. And respectfully, Your Honor, if the court were to look at those documents, it is as clear on its face as can be. This strikes me as a function that's normally handled by an accountant or auditor. Was there not an auditor or accountant that was looking at these documents? Your Honor, here we had... For that purpose. I apologize, Your Honor. Didn't mean to cut you off from the question. The accountants in the case had certain specified roles that they were doing. Here you had an insurance company that was stepping up to, in effect, potentially guarantee the payment of over $500 million worth of loans. It is not surprising that there were different functions laid on different participants in the overall transaction to describe and to afford protections to Royal as the insurer. But, for instance, and we cited in the record, Moody's in terms of looking at this transaction specifically talks about one of the comforts that Moody's as the rating agency had in looking at this transaction is the obligations, not that the accountants had, but that Wells Fargo had to compare and to look at this data to receive the data and to compare it to what was being received by the insurance company. So, yes, did the accountants have a role? Absolutely. You know, broad claims against accountants, and those matters have been settled for substantial sums at this point. All this information was also available to Royal, was it? No. This monthly and weekly information was provided only, only to Wells Fargo. They were the only ones receiving this information. That is why they were the ones who had the specific delineated duties to make that comparison. Your time is running short, but one of the principal arguments of Wells Fargo is that it was not our responsibility to review the documents because we received the documents as a backup service. Could you respond to that? Yes. They make that argument. The only problem they have is there is not one word in the agreements here that supports that position. When you look at Section 3.8, you look at Section 8.19, you look at Section 8.21, which are the core provisions that we're relying on here. Every single one of those describes that the trustee shall receive this information, not just talking about any particular capacity, not talking about how they're going to be able to just, you know, put it away in a lockbox of their own in some place and not look at it until sometime down the road. These were specific obligations that they assumed right up front on a month-by-month basis. Thank you. Thank you, Mr. Barr. Mr. Obis. May it please the Court, my name is Stephen Obis of Proskauer Rose, appearing on behalf of the counterclaim defendant, Wells Fargo Bank. There is no dispute in this case that the monthly servicer reports that Royal received and indeed that Wells Fargo received accurately reflected to the penny the amount that the bank received in its collection accounts from the lockbox accounts for each of the securitizations. Nor is there any dispute that the totals reflected in that report coincided with the totals, with the balances on each and every other tape of every description that is in this case. Including the access database? Including the access database. The totals all tied up to the penny. The essence of Royal's claim is that Wells Fargo should have perceived that the source of the payments was SFC, not the servicer, SFC. Servicer is SLS, which is an affiliate of SFC. The claim here is that SFC was actually making these payments out of funds that it obtained in subsequent deals. And the claim here is that Wells Fargo should have looked at these documents and said even though they are accurate in the sense that they report the actual amounts coming in on each loan, Wells Fargo has some obligation to warn about the source. The district court correctly recognized that there was no such obligation in the PSAs and indeed that the PSAs are very affirmative in negating that obligation. They provide that the trustee, that is Wells Fargo, is entitled to conclusively rely on the reports that it receives. It can treat them as complete and accurate. And it also says that the trustee is not required to make any factual investigation or audit, and indeed there was another party, Magladry and Pullen, who was designated to do the audit function, to take the monthly report and compare it to the business records of the servicer and report if there was any issue there. And, of course, they said there were no issues. And that's another report that the trustee was entitled to rely upon. So the district court interpreted the contracts to mean that you did not have to look at the access database files. Well, that's one of the points. I mean, the court also read the agreement correctly to say that this comparison that was required is not one that would have revealed the type of information that Royal is, after the fact, talking about. Let me speak about the access. Maybe we can discuss that. I'd like to. Supposing we disagree with the district court and supposing, hypothetically speaking, that we agree with Mr. Barr that you were supposed to look at the access database file. And if you had done it, you would have clearly seen that there is a fraud amiss in these documents. Okay. Even assuming that, the duty to Royal in this agreement is to compare a tape, and for reasons I hope to get to, it's not that tape, but even if it were that tape, to compare that tape to the servicer report and identify discrepancies in the report. That's the language of 8.19. In the servicer report. In the servicer report. But if you look at the access database file, he does make a good point. If you look at the payments that are made, how could you not conclude that there is a fraud amiss? If you look at all the payments or interest payments, almost no payments are payments on principle, and they all seem to be made at about the same time. In retrospect, a person looking at that with this in mind might well come to that conclusion. What was required here, if you look at, and these are tapes that were looked at under 8.21 by a party, first in Salt Lake City, Utah, not the trustee's office, and then in Des Moines, Iowa, and I want to get to that because it's simply not true that those access tapes were always sent to the trustee. They just were not in the first deal, and this is very important. But even assuming they were, even assuming they were, what happens was the person each week receives one of these tapes. He opens it to see that it's reasonable. The point, I mean readable, excuse me. The point is to be ready to step in and to service these accounts. So they load the tape. They see that the fields in the computer are populated by real numbers, not gibberish, and they look at the totals and they see that at least at the end of the month they compare to the monthly service report. You can't do that on a weekly basis because a weekly tape just says John Smith paid $47. John Jones promised in response to a phone call that he'd get his payment in. It's individual things about individual loans. The month-end access tape has a total. It did tie out to the monthly service report. And what Mr. Barr is saying is that if in addition to opening the tape you went to the end of the month or the end of the week and came to the day when these payments were listed and noticed that there were many on the same day, you might think that there was something peculiar about it. I think that's putting way too much on what was required when looking at these tapes. But even so, going back to what the obligations of the trustee were under this agreement, even assuming that Mr. Smith sitting in Salt Lake City opened the tape and said, gee, that's unusual, there wasn't any requirement. First of all, under 8.21 there's no reporting requirement at all to anyone, never mind no requirements to Royal. But even under 8.19 where there's this comparison, the comparison is take the totals, compare them to the totals here, and tell us if there's a difference. These are both reports that are coming from the same source. The idea is to catch a mathematical error, a record-keeping error. There's a specific admonition not to look beneath it to look to see if the facts are different than what are being stated here. What you're saying is that you had absolutely no obligation to look at the student transactions listed in this access database file. Not one by one. He was to look and see that the data was readable, that we were getting data we could use if we ever had to step in as the servicer, and that the totals, the balances. Mr. Barr suggests that even a cursory look at this document would raise red flags. Well, I disagree with it, but we also disagree that even if the red flags were raised, it implicated any contract obligation here. But on the assumption that the Court wouldn't be as satisfied with that, I really do want to get to a couple of other points because they're very important. Before you go, I asked your adversary, does the contract provide that all payments into the lockbox account must be made by student debtors? He said, well, it requires obligors. So, I mean, what's your position on that? Well, it's not correct. And even if you look at the provision, Royal quotes it in its own reply brief. All the provision says is that the servicer is to instruct obligors to make payments into the lockbox. It doesn't preclude anybody else from making payments into the lockbox. Certainly family members and friends and employers, anybody else could make a payment into the lockbox. One fact that's not disputed in this case is that at the end of the day, when Mr. Yao went to Royal and said, I'm not going to make any more forbearance payments and all these loans are going to go into default, Royal itself wired $12 million into those lockbox accounts to keep the loans from going into default while it looked into the situation. And whatever one makes of that fact, that's absolutely true. And in the record, though. Oh, yes, yes. Whatever one makes of that fact, it certainly illustrates that anybody can put money into the lockbox. All the servicer report says is that this is the amount of money that was transferred from the lockbox into the collection account of Wells Fargo. And that's absolutely true. It's also true that this is the amount that went into the lockbox. All that they're hanging on is the statement that obligors, as you might expect, are instructed to pay into the lockbox. It doesn't exclude anybody else from paying into the lockbox. And nor is there any representation in the servicer report itself about who is making these payments. And certainly to say that it was only the obligors and that Wells Fargo should have said there's a discrepancy because it was the obligors' grandmother or employer is absurd. What they're really saying is we should have seen this pattern. We should have seen that there was something nefarious about it. We should have reported it. And none of that, not only is it in the agreement, but the agreement says we don't have to do that. Doesn't the 3.8b, which defines tape, I mean, doesn't that impose some responsibility on you to inspect the tapes for the information contained? 3.8 is a provision that describes what the servicer is supposed to do. 8.19 and 8.21 are provisions that say what the trustee is supposed to do. And certainly you look at them together. And this is a very important point because Mr. Barr is flat wrong when he says that it was a constant that the access databases went to the trustee. In the first deal, there was no 8.21. There was no backup servicer. Instead, that function was filled by FANOVA as a separate party under a provision 9.9. So this would be in the PSA for 2000-1. And 3.8 says you're going to send to FANOVA, the master servicer, weekly tapes and the like. And that's what happened. The tapes were sent to Salt Lake. They were not sent to the trustee. 8.19 in that first deal reads exactly like it does in all the others. 8.20 says the trustee, so long as it is not a successor servicer, shall monitor the performance of the service. My point is there is no 8.20 in the first deal. In the first deal, there is no 8.20. There is no 8.21. And no access databases went to the trustee. They went to FANOVA under 9.9 to be what they called the master servicer in that deal, backup servicing function. And instead, under 8.19, the servicer is sent to Minnesota to the corporate trust office each month, one monthly service report, and these Excel databases with which the corporate trust department made the only comparison that was required under 8.19, as all of the parties to the contract itself understood. After FANOVA started having its own difficulties, the deal changed a bit, and instead of FANOVA being a separate contracting party, 8.21 was put into the contracts, and FANOVA became a subcontractor of Wells Fargo. The access databases continued to keep going to Salt Lake. They didn't go to Minnesota. FANOVA kept doing what it was doing, what it had been doing under the master servicer provision of the first deal, and Wells Fargo kept doing under 8.19 what it had been doing with the Excel databases, which even Royal concedes don't reflect even the discrepancy as they describe it. And so what Royal's argument boils down to is that even though 8.19, the words of 8.19 didn't change at all, once FANOVA became a subcontractor of the trustee, that its obligation was greater under 8.19 to look at new and different tapes. And that's not even taking into account that 8.19 identifies a single tape. It says you'll take the report, and you'll take the tape used to calculate the numbers in the report, and you'll compare them with respect to specific differences. And the servicer sent to the trustee each month the tape that it held out as being the one that it used for that purpose. The comparison was made, and there were no discrepancies. And the trustee was entitled to accept as genuine, complete, and accurate the tape that the servicer actually sent. And there's no better indication that the parties to the agreement, not Royal, which was not a party, the parties to the agreement understood how this would work because they say they found out in discovery that they pre-reconciled. Mr. Ovis, so your responsibility was limited to receiving the tapes, making sure that the tape was what it purported to be. Yes. That it was accurate information for what it was reporting. But it was not to review or examine the contents of the tape itself. Not even to determine that it was accurate other than to compare the total to make sure you had the right tape. But my earlier question was supposing we disagree with that. Supposing we believe that part of your responsibility was to examine the contents of the tape in the access database files. Would that review have disclosed a fraud on the part of the servicer? We think not. We think that that's classic retrospective evaluation of patterns that compare one tape to another. I understand that to be Mr. Barr's essential argument. Well, that's because he doesn't want to talk about what the contracts actually require. If you had looked at this, you would have seen clearly that there was a fraud being perpetrated. He says that and we disagree with that. But it really is not the heart of our position here. The trustee. It's not the heart of your position. That's right. It's the heart of his position. But his position doesn't deal with what the contract requires. The contract doesn't say you look at these patterns and if it seems to you the data is wrong. And I'm sorry to cut you off, but I was saying what if we disagree with your interpretation of the contract? Well, then, you know, there are a number of other provisions here that are important. One being that under 8.20, it specifically identifies the certificate holders as the third party for whose benefit this review of access tapes is being conducted. And it specifically says, and this is when the servicer, I'm sorry, when Wells Fargo took over this backup role from Finova, which had been a separate contracting party, it said we'll do this provided, however, that there will be no liability for monitoring the servicer in this way. It's a very explicit provision. And, of course, Royal argues that exculpatory provisions of this like are disfavored, but the very cases that it cites show that exculpatory clauses are routinely enforced if they meet certain requirements, namely that the deal be a private deal, not implicating public policy considerations, that the exculpatory provision be clear, and that it not be a contract of adhesion. It doesn't even require that the parties have equal balancing or rather bargaining power that could be, you know, a tenant or a consumer of spa services. Here you've got sophisticated parties of at least equal bargaining power, big financial companies, and they flat out agreed no liability for this. And now Royal, not even the party, wants to rewrite the contract. I'd also point out that the cases they cite show that even where an exculpatory clause could be construed in some circumstances to be too broad because it would excuse malicious conduct, for example, even then the clause will be enforced as applied in situations to negligent or nonfeasance if that's what the parties intended, that there be no liability. And here there's no question that the parties were entitled to enter into an agreement that says third parties have no rights at all, third parties cannot collect remote consequential damages of the sort that Royal is claiming here. So there just isn't any question there. Mr. Oberst, your time is up. Oh, I'm sorry. Thank you very much. Thank you very much. Mr. Barr. A few points, Your Honors. Number one, it is clear in every single one of the operative provisions here that it is the trustee, as the trustee that we are talking about and not in any capacity as a subsequent servicing entity. In 3.8B it says the servicer shall deliver to the trustee. In Section 8.19 it says that, and that's at page 3134 of the record, Section 8.19 says the servicer shall provide monthly to the trustee information and data via electronic submission, and goes on to say the trustee, so long it is not a successive servicer, shall, and then it delineates all the duties that they have under Section 8.1. Why doesn't that relate to the monthly service report? The monthly service report is a report that we receive and they receive. When you look in terms of the language that's contained in 8.19 as to the information they were supposed to look at, under 8.19A it says to accept delivery of the tape used to calculate the information contained in the service report. But does that mean they have to examine it to ascertain whether there's any fraud being committed? Your Honor, we are not suggesting, again, that they had to do anything complicated with respect to that. What we are saying here is very simple. They had an obligation to receive it and to examine it and to use it as part of the comparison they were obligated to do under 8.19 as well as under 8.21. And by the mere virtue of looking at it at all, they would have seen the fraud that I think this Court likewise will see when it looks at those documents. In response to a question that Joe Chigars raised earlier, the lockbox provision specifically states, and this is at page 3131 of the record, that the lockbox shall be open for the purpose of receiving all payments under the student loans from the obligors. It specifically limits it to the obligors. So it's not just a directive that they had to make with respect to who was supposed to make payment. That's what the lockbox was intended for. Further, when you look in terms of section 3.1, again at page 3129, and again this goes to the subservice appoint, it says the trustee shall be permitted to subcontract certain duties, but it shall maintain liability for the obligations that it has under this agreement. We are not saying, when you look at section 8.20, you look at section 8.21, the kinds of exculpatory provisions they're talking about. We are not seeking to hold them responsible for any malfeasance on the part of SFC. What we are seeking to hold them responsible for is their specific breaches of their specific contractual obligations that they had to us. In effect, what they're trying to do here, it's kind of an elaborate shell game. They're saying, you look at 3.8B, you look at 8.19, you look at 8.21, and then they say there's no P under any one of those cups. Because in effect, they say under 8.19, we weren't supposed to look at certain reports. And then they say under 8.21, yes, we were supposed to look at those reports, but you can't hold us responsible because our liability has been protected here. Respectfully, that's not what this agreement provided. This was part of an overall contractual arrangement. We are seeking to do nothing more than hold them responsible for specific contractual duties that they undertook, which are spelled out in 3.8B, 8.19, and 8.21. Thank you. Thank you, Mr. Barr. Any further questions? I have none. Thank you very much. Thank you both for a very good argument. Shall we take a little break? Yes, no problem. We'll take a few minutes.